CHRISTIAN L. MOORE, ESQ. (SBN 3777)
LAXALT LAW GROUP, LTD.
9790 Gateway Drive, Suite 200
Reno, NV 89521
(775) 322-1170
*Attorneys for Plaintiff ALPS Property & Casualty Insurance Company*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ALPS PROPERTY & CASUALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>LAW OFFICES OF ATIF SHEIKH, PLLC; ATIF M. SHEIKH, ESQ.; and CHRISTOPHER COBB,<br><br>Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff ALPS Property & Casualty Insurance Company ("ALPS"), pursuant to 28 U.S.C. §§ 2201(a) and 2202 and Federal Rules of Civil Procedure 8(a) and 57, for its complaint against Defendants Law Offices of Atif Sheikh, PLLC ("Sheikh Firm"), Atif M. Sheikh ("Sheikh" and together with the Sheikh Firm, "Sheikh Defendants"), and Christopher Cobb ("Cobb" and together with the Sheikh Defendants, "Defendants") alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1. ALPS is an insurance company and corporation organized under the laws of the State of Montana with its principal place of business in the State of Montana; ALPS is a citizen of the State of Montana.

/ /

2. The Sheikh Firm is, upon information and belief, a professional limited liability company formed under the laws of the State of Nevada with its principal place of business in Las Vegas, Nevada, located in Clark County, Nevada. Sheikh is, upon information and belief, the sole member of the Sheikh Firm such that the Sheikh Firm is, upon information and belief, a citizen of the State of Nevada.

3. Sheikh is, upon information and belief, an attorney licensed in the State of Nevada; the sole member of the Sheikh Firm, whose principal place of business is located in Las Vegas, Nevada; and, upon information and belief, a resident of the State of Nevada; Sheikh is, upon information and belief, domiciled in and a citizen of the State of Nevada.

4. Cobb is, upon information and belief, domiciled in and a citizen of the State of Nevada.

5. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists between ALPS and Defendants, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b), and in this Division, pursuant to LR IA 1-8, because a substantial part of the events giving rise to the claims for relief occurred in this District.

## GENERAL ALLEGATIONS

### I. Introduction

7. In this insurance coverage action, ALPS seeks a judgment declaring Lawyers Professional Liability Insurance Policy No. ALPS22441-6 issued by ALPS to the Sheikh Firm for the policy period December 19, 2023 to December 19, 2024 ("Policy") does not afford coverage with respect to the claim ("Claim") by Cobb against the Sheikh Defendants, as presently articulated in the suit styled *Christopher Cobb v. Atif M. Sheikh, Esq., Law Offices of*

*Atif Sheikh, PLLC, et al.*, No. A-25-926167-C (Dist. Ct. Clark Cty., Nev.) ("Underlying Suit"). A true and correct copy of the Policy is attached as Exhibit 1. A true and correct copy of the August 20, 2025 Complaint ("August 2025 Complaint") in the Underlying Suit is attached as Exhibit 2.

## II. Background

### A. Sheikh Defendants' Representation of Cobb in the Cobb Suit

8. The Claim arises from the Sheikh Defendants' representation of Cobb in the suit styled *Christopher Cobb v. Central Florida Investments Inc. d/b/a Westgate Las Vegas Resort and Casino, et al.*, No. A-21-835233-C (Eighth Jud. Dist. Ct., Clark Cty., Nev.) ("Cobb Suit"). (Exhibit 2 ¶¶ 1, 12-13). *See also* Correspondence from Cobb's Counsel to ALPS dated on or around June 27, 2025 ("June 2025 Correspondence")[1] at 1. A true and correct copy of the June 2025 Correspondence is attached as Exhibit 3.

9. The Cobb Suit arises from a slip-and-fall incident at the Westgate Las Vegas Resort and Casino ("Westgate Casino") on June 8, 2019 ("June 2019 Incident"), in which Cobb alleges water on the floor of a bathroom in the Westgate Casino caused Cobb to fall and resulted in "a multitude of injuries to [Cobb] that eventually required injections and a recommendation for surgery." (Exhibit 3 at 1; Exhibit 2 ¶ 15).

10. Cobb alleges, as a result of the June 2019 Incident, he received "chiropractic care for [Cobb's] neck and lumbar spine, MRI's taken of the neck, lumbar spine and right knee, epidural injections and a consultation and recommendation for surgery from a Board Certified Orthopedic Surgeon." (Exhibit 3 at 1). Cobb further alleges "[t]his treatment resulted in

[1] The June 2025 Correspondence is dated "May 20, 2024", which ALPS understands to be a typographical error. ALPS received the June 2025 Correspondence on June 27, 2025.

thousands of dollars in medical expenses directly related to the negligence of" Westgate Casino. (*Id*. at 1-2).

11. On or around April 5, 2021, Cobb alleges he "retained" the Sheikh Defendants "to represent [Cobb] in an action against" Westgate Casino arising from the June 2019 Incident. (Exhibit 2 ¶ 17; Exhibit 3 at 1).

12. On or around May 25, 2021, on behalf of Cobb, the Sheikh Defendants filed Cobb's complaint against Westgate Casino and DFW Motel Supply Textiles, Inc. ("DFW") in the Cobb Suit. (Exhibit 2 ¶ 17). *See also* Docket from the Cobb Suit ("Cobb Suit Docket"); a true and correct copy of the Cobb Suit Docket is attached as Exhibit 4.

13. On or around August 21, 2023, DFW filed a "Notice of Settlement" in the Cobb Suit. (Exhibit 4; Exhibit 2 ¶ 17).

14. Cobb alleges, on or around September 12, 2023, the Sheikh Defendants "contacted [Cobb] about a proposed settlement" in the Cobb Suit. (Exhibit 2 ¶ 19). Cobb further alleges: DFW "had agreed to pay [Cobb] $25,000 to settle" the Cobb Suit; Westgate Casino "agreed to pay [Cobb] $15,000 to settle" the Cobb Suit; on or around September 12, 2023, Cobb "rejected those proposed settlements"; on or around September 18, 2023, Cobb "emailed [the Sheikh Defendants] to memorialize his rejection of the proposed settlement"; the Sheikh Defendants "did not reply" to Cobb's September 18, 2023 email correspondence; on or around September 21, 2023, "counsel for Westgate [Casino] signed the proposed Stipulation and Order to Dismiss with Prejudice" the Cobb Suit; on or around September 22, 2023, "counsel for DFW filed the Stipulation and [O]rder to Dismiss with Prejudice" in the Cobb Suit, "which the court signed and electronically served to" the Sheikh Defendants; and on or around September 22, 2023, the court dismissed the Cobb Suit. (*Id*. ¶¶ 20-26).

/ /

15. Cobb alleges the Sheikh Defendants —"without the permission of" Cobb and contrary to Cobb's "expressed rejection"—settled the Cobb Suit "for well below the value of [Cobb]'s claimed damages against" Westgate Casino. (Exhibit 3 at 2).

16. Cobb further alleges: the Sheikh Defendants' settlement of the Cobb Suit "was in direct conflict and against the wishes of [the Sheikh Defendants'] client," Cobb, "and in violation of the Professional Rules of Conduct"; the Sheikh Defendants "ceased communicating with counsel for DFW and counsel for Westgate [Casino] after the Stipulation and Order to Dismiss with prejudice was filed with the court" in the Cobb Suit; the Sheikh Defendants "never acquired the settlement" funds from DFW or Westgate Casino; Cobb "never received any portion of the proposed settlement"; and the Sheikh Defendants "never provided [Cobb] with a copy of his client file." (Exhibit 3 at 2; Exhibit 2 ¶¶ 27-31).

17. Sheikh admits the Sheikh Defendants "authorized the opposing parties to apply [Sheikh's] signature to [the] proposed stipulation and order to dismiss [the Cobb Suit], despite [the Sheikh Defendants'] client rejecting the settlement offer." (February 18, 2025 Order of the Supreme Court of the State of Nevada ("February 2025 Order") in the proceedings styled *In the Matter of Discipline of Atif M. Sheikh, Bar No. 14617* ("Sheikh Disciplinary Proceedings") at 2. A true and correct copy of the February 2025 Order is attached as Exhibit 5.).

18. Sheikh further admits: "[t]he opposing parties filed the proposed order with the court" in the Cobb Suit, "which the district court signed and dismissed the matter"; the "court electronically served [Sheikh] with the dismissal order, but [Sheikh] did not inform [Cobb], who found out about the dismissal through an independent search of court records"; and Sheikh "did not ensure receipt of the settlement proceeds and thus [Cobb] did not receive the funds." (Exhibit 5 at 1-2).

/ /

**B. Sheikh Disciplinary Proceedings**

19. On or around October 13, 2023, Cobb filed a complaint ("Cobb Bar Complaint") against Sheikh with the Nevada State Bar arising from the Sheikh Defendants' representation of Cobb in the Cobb Suit. (June 14, 2024 Complaint against Sheikh by the Office of Bar Counsel for the State Bar of Nevada ("Nevada State Bar") in the Sheikh Disciplinary Proceedings ("June 2024 Bar Complaint") ¶ 60. A true and correct copy of the June 2024 Bar Complaint is attached as Exhibit 6.).

20. On June 14, 2024, the State Bar of Nevada filed the June 2024 Bar Complaint against Sheikh in the Sheikh Disciplinary Proceedings. (Exhibit 6). In the June 2024 Bar Complaint, the State Bar of Nevada addressed Cobb's allegations in the Cobb Bar Complaint and the allegations in another complaint against Sheikh pending with the Nevada State Bar, filed in or around September 2023 by Karim Iaachfoubi ("Iaachfoubi Bar Complaint"). (Exhibit 5 at 1; Exhibit 6).

21. In the June 2024 Bar Complaint, with respect to the Nevada State Bar's communications with Sheikh concerning the Cobb Bar Complaint, the Nevada State Bar alleged: "[o]n or about October 13, 2023, [Cobb] filed a grievance with the [Nevada] State Bar against" Sheikh; Sheikh "must provide a permanent telephone number and current email address to the [Nevada] State Bar pursuant to [Supreme Court Rule ("SCR")] 79(1)"; Sheikh "provided a SCR 79(1) permanent telephone number to the [Nevada] State Bar"; Sheikh "provided a SCR 79(1) current email address to the [Nevada] State Bar"; "[o]n or about October 24, 2023, the [Nevada] State Bar emailed [Sheikh] a letter of inquiry to [Sheikh's] current SCR 79 email address seeking a response to" the Cobb Bar Complaint; "[o]n or about November 7, 2023, [Sheikh] replied to the [Nevada] State Bar that [Cobb] agreed with the proposed settlement and authorized him to settle" the Cobb Suit; Sheikh "provided no documentation, records, or client communication to

support this claim"; "[o]n or about November 7, 2023, [Sheikh] stated [he] would contact" Cobb; "[o]n or about November 13, 2023, the [Nevada] State Bar emailed [Sheikh] a letter of investigation to [Sheikh's] SCR 79 current email address"; and Sheikh "did not reply to the November 13, 2023 letter of investigation." (Exhibit 6 ¶¶ 60-68).

22. In the June 2024 Bar Complaint, the Nevada State Bar alleged the Sheikh Defendants, *inter alia*, violated the Nevada Rules of Professional Conduct in connection with the Sheikh Defendants' representation of Cobb in the Cobb Suit. (Exhibit 6 ¶¶ 86-99, 104-108, 113-121). The Nevada State Bar recommended "such disciplinary action be taken by the Southern Nevada Disciplinary Board against [Sheikh] as may be deemed appropriate under the circumstances." (*Id*., Prayer for Relief).

23. By order dated February 18, 2025 in the Sheikh Disciplinary Proceedings, the Supreme Court of the State of Nevada approved a recommendation by the Southern Nevada Disciplinary Board concerning the "agreed-upon discipline" for Sheikh in response to the Cobb Bar Complaint and the Iaachfoubi Bar Complaint. (Exhibit 5 at 2-4). In "exchange for a stated form of discipline" in the Sheikh Disciplinary Proceedings, Sheikh admitted to violating the following Nevada Rules of Professional Conduct in connection with the Sheikh Defendants' representation of Cobb and Karim Iaachfoubi: "RPC 1.2(a) (scope of representation and allocation of authority between client and lawyer)"; "RPC 1.4(a) (communication)"; "RPC 1.16(c), (d) (declining or terminating representation)"; "RPC 3.4(c) (fairness to opposing party and counsel)"; "RPC 8.1(b) (bar admission and disciplinary matters)"; and "RPC 8.4(d) (misconduct)[.]" (*Id*. at 1). Sheikh further admitted to "knowingly violating duties owed to his clients . . . and to the profession and legal system" and causing "harm or potential harm to his clients." (*Id*. at 3).

/ /

24. In the February 2025 Order, the Supreme Court of the State of Nevada approved the disciplinary recommendation by the Southern Nevada Disciplinary Board, to which Sheikh agreed, and suspended Sheikh from the practice of law for six months and one day from the date of the February 2025 Order—February 18, 2025—"with the suspension stayed for twenty-four months subject to" specific conditions described in the February 2025 Order. (Exhibit 5 at 1, 4).

**C. The Claim**

**1. Cobb's Pre-Suit Demands**

25. By correspondence dated May 20, 2024 ("May 2024 Correspondence"), Cobb's counsel provided ALPS with notice of "a potential legal claim" against the Sheikh Defendants arising from the Sheikh Defendants' representation of Cobb. (May 2024 Correspondence at 1. A true and correct copy of the May 2024 Correspondence is attached as Exhibit 7.). The May 2024 Correspondence demanded "disclosure of all applicable policy limits of" the Sheikh Defendants. (Exhibit 7 at 1).

26. By correspondence to ALPS dated on or around June 27, 2025, Cobb's counsel provided ALPS with limited additional information regarding the Claim. (Exhibit 3). In the June 2025 Correspondence, Cobb alleged professional negligence and legal malpractice against the Sheikh Defendants with respect to the Sheikh Defendants' representation of Cobb in the Cobb Suit, alleged Cobb "suffered monetary and emotional damages as a result" of the Sheikh Defendants' "ineffective and negligent representation" of Cobb in the Cobb Suit, and demanded "tender of all applicable policy limits" to resolve the Claim on or before July 29, 2025. (*Id.* At 1-2) (emphasis in original). Cobb alternatively proposed "pre-litigation mediation with Advanced Resolution Management or other alternative means of resolution[.]" (*Id.*).

/ /

### 2. The Underlying Suit

#### a. August 2025 Complaint

27. On August 20, 2025, Cobb filed the August 2025 Complaint against the Sheikh Defendants in the Underlying Suit. (Exhibit 2). In the August 2025 Complaint, Cobb alleges three causes of action arising from the Sheikh Defendants' representation of Cobb in the Cobb Suit: "legal malpractice" against the Sheikh Defendants; vicarious liability against the Sheikh Firm; and breach of fiduciary duty against the Sheikh Defendants. (*Id.*).

28. In Cobb's first cause of action, for "legal malpractice" against the Sheikh Defendants, Cobb alleges: an "attorney-client relationship existed between" Cobb and the Sheikh Defendants; the Sheikh Defendants "owed a duty to [Cobb] to render legal advice and services to [Cobb] with competence and diligence, consistent with the ethical requirements and standard of care of the legal profession"; the Sheikh Defendants owed a duty "to make complete disclosure to [Cobb] of all material matters"; and the Sheikh Defendants "owed [Cobb] a duty to exercise due care regarding evidentiary discovery and disclosure, as well as settlement negotiation and tactics, in a manner to protect [Cobb]'s interests." (Exhibit 2 ¶¶ 38, 40). Cobb further alleges the Sheikh Defendants "knew or should have known that [Cobb] was relying on their legal advice and expertise as well as in negotiating a settlement in the best interest of [Cobb] without a conflict of interest." (*Id.* ¶ 41).

29. Cobb alleges the Sheikh Defendants "breached their duty of due care in many ways, including but not limited to": (a) "[f]ailing to abide by [Cobb]'s decision concerning the objectives of representation;" (b) "[f]ailing to consult with [Cobb] as to the means by which objectives of representations are to be pursued;" (c) "[f]ailing to abide by [Cobb]'s decision whether to settle a matter;" (d) "[f]ailing to act with reasonable diligence and promptness in representing" Cobb; (e) "[f]ailing to promptly inform [Cobb] of any decisions or circumstance

with respect to which [Cobb]'s informed consent is required;" (f) "[f]ailing to reasonably consult with [Cobb] about the means by which [Cobb]'s objectives are to be accomplished;" (g) "[f]ailing to keep [Cobb] informed about the states of the matter;" (h) "[f]ailing to promptly comply with reasonable requests for information by" Cobb; (i) "[f]ailing to promptly and diligently resolve [Cobb]'s matter and or respond to [Cobb]'s reasonable requests for information;" (j) "[f]ailing to take steps reasonably practicable to protect [Cobb]'s interests when [the Sheikh Defendants] failed to provide [Cobb] a copy of his file;" and (k) "[b]y engaging in conduct prejudicial to the administration of justice by settling [Cobb]'s matter and stipulating to dismiss" the Cobb Suit "with prejudice without [Cobb]'s consent." (Exhibit 2 ¶ 42).

30. Cobb alleges the Sheikh Defendants "did not take action commensurate with the standards of practice within the community for attorneys at law, and as the direct and proximate result of [the Sheikh Defendants'] negligence, [Cobb] has been substantially damaged." (Exhibit 2 ¶ 43). Cobb further alleges, "to the extent such negligence rises to the level of gross negligence", Cobb's allegations in the August 2025 Complaint's professional negligence cause of action "may give rise to a claim for punitive damages against" the Sheikh Defendants. (*Id.* ¶ 34).

31. In Cobb's second cause of action, for vicarious liability against the Sheikh Firm, Cobb alleges: the Sheikh Firm "was owned and operated by" Sheikh; the conduct by Sheikh alleged in the August 2025 Complaint "occurred within the general authority given to [Sheikh] by [the Sheikh Firm] in furtherance of [the Sheikh Firm]'s business"; "[a]s a result of [the Sheikh Firm]'s failure to exercise its power and control over [Sheikh], [Cobb] was damaged"; "[a]s a direct and proximate result of the actions of" the Sheikh Firm described in the August 2025 Complaint, Cobb "has in the past, and will in the future, suffer general damages in a sum in excess of $15,000"; "[a]s a direct and proximate result of the actions of" the Sheikh

Firm described in the August 2025 Complaint, Cobb "has in the past, and will in the future, incur incidental damages in a sum to be determined at the time of trial"; and "[a]s a direct and proximate result of the actions of" the Sheikh Firm described in the August 2025 Complaint, Cobb "has been required to engage the services of an attorney, incurring attorney fees and costs to bring" the Underlying Suit. (Exhibit 2 ¶¶ 44-50).

32. In Cobb's third cause of action, for breach of fiduciary duty against the Sheikh Defendants, Cobb alleges: "the most confidential, fiduciary relationship existed between" Cobb and the Sheikh Defendants; the Sheikh Defendants "were obligated by the attorney-client fiduciary relationship to" comply with the "[d]uty of loyalty and utmost good faith", the "[d]uty of candor", the "[d]uty to act with integrity of the strictest kind", the "[d]uty of fair, honest dealing", and the "[d]uty of full disclosure"; the "duty of honesty required [the Sheikh Defendants] to not only disclose all information necessary to make informed decisions, but also disburse [Cobb]'s settlement proceeds in a timely fashion"; and the Sheikh Defendants "breached their fiduciary duties by failing to act in the best interest of [Cobb], failing to communicate with [Cobb], failing to properly represent [Cobb], and failing to disburse the entirety of [Cobb]'s settlement proceeds." (Exhibit 2 ¶¶ 52-55).

33. Cobb alleges, "as a direct and proximate result of the actions of" the Sheikh Defendants described in the August 2025 Complaint's breach of fiduciary duty cause of action, Cobb "has in the past and will in the future": "suffer general damages in a sum in excess of $15,000"; "incur incidental damages in a sum to be determined at the time of trial"; and "has been required to engage the services of an attorney, incurring attorney fees and costs to bring" the Underlying Suit. (Exhibit 2 ¶¶ 56-58). Cobb further alleges, "to the extent such negligence rises to the level of gross negligence", Cobb's allegations in the August 2025 Complaint's breach

/ /

of fiduciary duty cause of action "may give rise to a claim for punitive damages against" the Sheikh Defendants. (*Id.* ¶ 34).

34. In the August 2025 Complaint's Prayer for Relief, Cobb seeks: compensatory damages against the Sheikh Defendants, "jointly and severally, in an amount equal to all direct, consequential, and other damages [Cobb] has suffered, in amounts to be proven at trial in this matter"; punitive damages against the Sheikh Defendants, "jointly and severally, in connection with the causes of action" in the August 2025 Complaint "in an amount to be determined by the [c]ourt"; costs and attorneys' fees incident to the Underlying Suit; and "such other and further relief as the [c]ourt may deem proper." (Exhibit 2, Prayer for Relief).

35. As to punitive damages, Cobb alleges the Sheikh Defendants "may be liable for punitive damages to the extent the evidence shows that (1) [the Sheikh Defendants] are guilty of 'oppression, fraud or malice, express or implied,' (2) [the Sheikh Defendants'] actions constituted conduct intended to injure [Cobb], and/or (3) [the Sheikh Defendants'] actions constitute 'despicable conduct which is engaged in with a conscious disregard of the rights of others' under NRS 42.001(3)." (Exhibit 2 ¶ 35). Cobb further alleges "[t]o the extent [the Sheikh Defendants] acted intentionally and/or in concert with each other, [the Sheikh Defendants] are subject to joint and several liability for all damages resulting therefrom." (*Id.* ¶ 36).

**b. Cobb's Application for Default Judgment**

36. On December 2, 2025, after the Sheikh Defendants failed to answer or otherwise respond to the August 2025 Complaint, the Clerk of the Court in the Underlying Suit entered a default against the Sheikh Defendants. (Cobb's August 28, 2026 Application for Default Judgment against the Sheikh Defendants in the Underlying Suit ("August 2026 Default Judgment Application") at pp. 1, 3 and Attach. 6. A true and correct copy of the August 2026 Default Judgment Application is attached as Exhibit 8.).

37. In Cobb's Declaration in Support of the August 2026 Default Judgment Application, Cobb alleges: the Sheikh Defendants "made a deal behind [Cobb's] back to accept the low settlement offer from Westgate and [the Cobb Suit] was dismissed without [Cobb] receiving any justice"; Cobb "never received one penny of the settlement that [the Sheikh] Defendants kept for themselves"; Cobb continues "to experience a great deal of physical pain, mental anguish, and stress to go along with the tens of thousands of dollars the [Sheikh] Defendants stole from [Cobb] and the much higher amount of money [Cobb's] case was worth"; and "[a]s a result of [the Sheikh] Defendants lies and misconduct, [Cobb] has had to retain counsel and incur additional costs." (Exhibit 8, Declaration of Cobb in Support of the August 2026 Default Judgment Application ¶¶ 11-15).

38. As to relief, in the August 2026 Default Judgment Application, Cobb alleges: "[g]iven the outrageous and intentional misconduct committed by" the Sheikh Defendants, Cobb "is entitled to an award of punitive damages"; the Sheikh Defendants' "actions have been committed with fraud, oppression and/or malice, entitling [Cobb] to punitive damages against" the Sheikh Defendants; the Sheikh Defendants "have converted and unjustly retained [Cobb]'s property in a despicable and inequitable manner." (Exhibit 8 at pp. 10-11). Cobb seeks: $600,000 in compensatory damages related to past and future medical expenses arising out of the June 2019 Incident; "$1,800,000.00 in pain and suffering damages"; punitive damages "in excess of $1,800,000", which is "three times compensatory damages [Cobb] is claiming"; $843.49 in costs incident to the Underlying Suit; and prejudgment and post-judgment interest. (*Id*. at 10-12).

/ /

/ /

/ /

## III. The Policy

### A. 2023 Application

39. On October 19, 2023, Sheikh, on behalf of the Sheikh Firm, executed a renewal application ("2023 Application") for the Policy.

40. In the 2023 Application, Sheikh answered "No" to the questions:

a. After inquiry with all members of the Firm, has any attorney or employee in the Firm become aware of or have knowledge of any potential claim, fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against any current or former attorney in the Firm or its predecessors, regardless of the merit of such claim or potential claim?

b. Has any disciplinary investigation or inquiry commenced, or has any disciplinary complaint been made against any attorney in the Firm before any court, administrative agency, or regulatory body, including but not limited to the SEC, or office of any state Bar disciplinary counsel?

41. The 2023 Application provides:

> Failure to report any claim made against the applicant Firm or any attorney in the applicant Firm under any current or previous insurance policy, or failure to timely disclose facts, events or circumstances which may give rise to a claim against any current or prior insured, may result in the absence of insurance coverage for any such claim, facts, events, or circumstances which should have been reported, and may result in the cancellation or rescission of any policy ALPS may issue in reliance upon this application.

(2023 Application at 2).

### B. Policy

42. ALPS issued the Policy to the Sheikh Firm for the policy period December 19, 2023 to December 19, 2024. (Exhibit 1, Declarations Items 1 and 4). The Policy provides limits of liability of $500,000 each claim and $500,000 in aggregate. (*Id.*, Declarations Item 5).

43. Sheikh is listed as the sole individual attorney insured under the Policy. (Exhibit 1, Declarations Item 3).

/ /

44. The Policy provides legal professional liability insurance on a claims made and reported basis. (Exhibit 1, Insuring Agreements § 1.A).

45. The Policy's insuring agreement states, in relevant part:

> A. COVERAGE
>
> Subject to the Limit of Liability, exclusions, conditions and other terms of this Policy, the Company agrees to pay on behalf of the Insured all sums (in excess of the Deductible amount) that the Insured becomes legally obligated to pay as Damages, arising from or in connection with A CLAIM FIRST MADE AGAINST THE INSURED AND FIRST REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD, provided that all of the following conditions are satisfied:
>
> 1. The Claim arises from a Wrongful Act that occurred on or after the Retroactive Coverage Date set forth in Item 2 of the Declarations;
>
> 2. At the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the Wrongful Act might be the basis of a Claim;
>
> 3. Notice of the Claim or the Wrongful Act was not given nor required to be given to any other insurer prior to the Effective Date; and
>
> 4. The Claim is not otherwise covered under any other insurance policy that the Company has issued to the Named Insured.
>
> B. DEFENSE AND CLAIM EXPENSES
>
> 1. For any Claim seeking the recovery of Damages from the Insured and otherwise covered under this Policy, the Company shall have the right and the duty to defend such Claim even if any or all of the allegations of the Claim are groundless, false or fraudulent[.] . . .
>
> 2. The Company shall pay Claim Expenses in accordance with the terms of this Policy. The Company shall not have a duty to defend or to pay such expenses as to any Claim not covered under this Policy, and shall have the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered Claim, including any amount paid in defending a non-covered Claim that is asserted together with one or more covered Claims.

(Exhibit 1, Insuring Agreements §§ 1.A-1.B.2) (emphasis in original).

46. "Claim" is defined in the Policy as "a demand for money or services including, but not necessarily limited to, the service of suit or institution of arbitration or alternative dispute

resolution proceedings against the Insured." (Exhibit 1, Definitions § 2.C). The Policy provides: "Claim does _not_ mean _nor_ include any demand, service or proceeding arising from or in connection with any actual or alleged:"

> 7. Notice or written demand arising from or in connection with any disciplinary, investigatory or other proceeding before a state licensing board, peer review committee or governmental regulatory body involving an Insured Attorney; . . . [or]
>
> 10. Bodily Injury of any person.

(*Id.*, Definitions §§ 2.C.7, 2.C.10) (emphasis in original).

47. "Wrongful Act" is defined in the Policy as "an actual or alleged: (1) [a]ct, error, or omission by the Insured in the performance of Professional Services; and (2) [a] Personal Injury resulting from the Professional Services of the Insured." (Exhibit 1, Definitions § 2.BB). The Policy provides "Wrongful Act does not mean nor include an act, error, or omission resulting in Bodily Injury." (*Id.*).

48. "Bodily Injury" is defined in the Policy as "any injury to the body, any sickness or disease, or any death", and "includes any mental, psychological, or emotional injury, anguish, tension, distress, pain, suffering, shock or death, regardless of whether or not such condition arises from any injury to the body, from any sickness or disease, or from any death." (Exhibit 1, Definitions § 2.B).

49. Under the Policy, "Professional Services" are defined as "services or activities performed for and on behalf of the Named Insured or a Predecessor Law Firm and rendered solely to others as", in relevant part, "[a]n Attorney in an attorney-client relationship on behalf of one or more clients applying the Attorney's specialized education, knowledge, skill, labor, experience and/or training, including pro bono services[.]" (Exhibit 1, Definitions § 2.Z.1).

/ /

50. The Policy provides "Professional Services does *not* mean nor include any . . . [h]olding, possessing, controlling, supervising, disbursing, or otherwise handling or overseeing in any manner or nature whatsoever any funds or property of the Insured, or of any client, trust, estate, person, or any other third party[.]" (Exhibit 1, Definitions § 2.Z.13) (emphasis in original).

51. "Damages" is defined in the Policy as "any . . . [m]onetary award by way of judgment or final arbitration, or any settlement;" the Policy specifically excludes from the definition of "Damages":

> 3. Punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorney's fees or costs, or pre-judgment or post-judgment interest resulting therefrom, regardless against whom the same are levied or imposed and regardless of whether the same were levied or imposed in a separate matter or proceeding;
>
> 4. Awards deemed uninsurable by law;
>
> 5. Injunctive, declaratory, or other equitable relief, or costs or fees incident thereto;
>
> 6. Restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured;
>
> 7. Judgment, award, verdict, decision or order that includes, as a measure, element or portion of the damages or award set forth therein, any amount the basis of which was determined by reference to the amount of fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an Insured;
>
> 8. Injury or damage to, destruction of, loss of, or loss of use of any funds or property; [and]
>
> 9. Pollution, contamination or erosion of any property.

(Exhibit 1, Definitions § 2.H).

52. "Claim Expenses" is defined in the Policy, in relevant part, as "[f]ees charged by any attorney(s) designated" by ALPS "to defend a Claim or otherwise represent an Insured;" and

"[a]ll other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a Claim (including a suit or proceeding arising in connection therewith), if incurred by [ALPS]." (Exhibit 1, Definitions §2.D.).

53. The Policy does not apply to:

> ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny Wrongful Act that occurred prior to the Effective Date of this Policy, if . . . [p]rior to the Effective Date of this Policy, any Insured gave or should have given to any insurer, notice of a Claim or potential Claim arising from or in connection with the Wrongful Act, or from any Wrongful Act that is connected temporally, logically or causally, by any common fact, circumstance, situation, transaction, event, advice or decision to the Claim or potential Claim.

(Exhibit 1, Exclusions § 3.E.3) (emphasis in original).

54. The Policy does not apply to any claim arising from or in connection with "[a]ny loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property[.]" (Exhibit 1, Exclusions § 3.H).

55. The Policy does not apply to any claim arising from or in connection with "[a]ny dispute over fees or costs, or any Claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held or controlled at any time by an Insured[.]" (Exhibit 1, Exclusions § 3.I).

56. The Policy does not apply to any claim arising from or in connection with "[a]ny dishonest, fraudulent, criminal, malicious, or intentionally harmful Wrongful Act committed by, at the direction of, or with the consent of an Insured[.]" (Exhibit 1, Exclusions § 3.A).

/ /

/ /

57. The Policy provides:

C. ASSISTANCE AND COOPERATION OF THE INSURED

1. Each Insured shall cooperate with the Company in its investigation of any Claim, including, without limitation, by promptly complying with all requests for and Insured to submit to or to provide any statements, including any sworn statements or statements under oath of any Insured, reports, documents, or other information, and by providing copies of all pertinent files upon request.

2. Each Insured shall cooperate and assist, as requested, in the defense of any Claim, in making any settlements, and in enforcing any right of contribution or indemnity against any person. If requested by the Company, such assistance may include, without limitation, attendance at hearings and trials and assistance in securing and giving evidence and in obtaining the attendance of witnesses. Neither the Insured nor the Insured's legal representative shall impede the Company's investigation or defense of any Claim. Neither the Insured nor the Insured's legal representative shall in any manner impair the right of the Company to make any settlement that the Company deems, in its discretion, to be reasonably necessary pursuant to any statutory or common law requirements concerning the fair or unfair claim settlement practices of insurers.

3. Each Insured shall notify the Company of any demand to arbitrate a Claim against an Insured, and any right to demand arbitration of a Claim, and in the event the Company elects to proceed with arbitration, shall cooperate in any such proceeding.

4. No Insured shall, without the Company's prior written consent, engage in any of the following with respect to any Claim or potential Claim: (a) make any payments; (b) admit any liability; (c) stipulate to the entry of a judgment against the Insured; (d) settle any Claim; € assume any obligation; (f) negotiate any tolling agreement; or (g) incur any expense. If an Insured engages in or offers to engage in any of the foregoing, the Insured shall do so at the Insured's own liability and expense, and such engagement, action or offer by the Insured shall be deemed to be a breach of the Insured's duty to cooperate with the Company with respect to such Claim or potential Claim.

(Exhibit 1, Conditions § 6.C).

**IV. Notice to ALPS and Claim-Related Communications**

58. By correspondence dated May 20, 2024, Cobb's counsel first provided ALPS with notice of the Claim and a copy of the May 2024 Correspondence. (Exhibit 7).

/ /

/ /

59. Subsequent to ALPS's receipt of the May 2024 Correspondence, and subject to ALPS's reservation of rights, ALPS engaged defense counsel ("Defense Counsel") for the Sheikh Defendants to investigate and defend against the Claim.

60. ALPS and Defense Counsel repeatedly attempted to contact the Sheikh Defendants by telephone, email, and with an in-person visit to the Sheikh Firm's office, all without success and without any response from the Sheikh Defendants.

61. By correspondence dated August 6, 2024 ("August 2024 Correspondence"), ALPS reiterated its prior requests the Sheikh Defendants provide copies of all materials pertaining to the representation of Cobb incident to the Claim. ALPS received no response from the Sheikh Defendants to the August 2024 Correspondence.

62. By correspondence of June 27, 2025, Cobb's counsel provided ALPS with a copy of the June 2025 Correspondence. (Exhibit 3).

63. By correspondence to the Sheikh Defendants dated July 15, 2025 ("July 2025 Correspondence"), ALPS provided its position regarding coverage under the Policy for the Sheikh Defendants with respect to the Claim, as articulated in the June 2025 Correspondence, reminded the Sheikh Defendants of their obligations under the Policy to assist and cooperate with ALPS in the investigation of and defense against the Claim, and reiterated ALPS's prior requests for file materials and other information relevant to the Claim. ALPS received no response from the Sheikh Defendants to the July 2025 Correspondence.

64. On August 20, 2025, Cobb filed the August 2025 Complaint against the Sheikh Defendants in the Underlying Suit. ALPS and Defense Counsel subsequently repeatedly attempted to contact the Sheikh Defendants regarding the Underlying Suit, all without success and without any response from the Sheikh Defendants.

/ /

65. By correspondence to the Sheikh Defendants dated September 23, 2025 ("September 2025 Correspondence"), ALPS supplemented the July 2025 Correspondence and provided its position regarding coverage under the Policy for the Sheikh Defendants with respect to the Claim, as presently articulated in the Underlying Suit. In the September 2025 Correspondence, ALPS denied coverage with respect to the Claim.

66. By correspondence dated October 13, 2025 ("October 2025 Correspondence"), ALPS provided notice to the Sheikh Defendants that ALPS intended to withdraw its defense of the Sheikh Defendants with respect to the Claim effective October 17, 2025. ALPS received no response from the Sheikh Defendants to the October 2025 Correspondence and, on October 17, 2025, ALPS withdrew its defense of the Sheikh Defendants with respect to the Claim.

67. By correspondence dated January 16, 2026 ("January 2026 Correspondence"), Cobb's counsel provided ALPS with notice of defaults entered against the Sheikh Defendants in the Underlying Suit and, on behalf of Cobb, demanded "tender of all applicable insurance policy limits" to resolve the Claim on or before February 6, 2026. A true and correct copy of the January 2026 Correspondence is attached as Exhibit 9.

68. In response, by correspondence to Cobb's counsel dated January 29, 2026, ALPS declined Cobb's demand for "tender of all applicable insurance policy limits" and advised Cobb there is no coverage for the Sheikh Defendants under the Policy, or any other policy ALPS issued to the Sheikh Firm, with respect to the Claim.

/ /

/ /

/ /

/ /

## FIRST CAUSE OF ACTION

**(For a Declaration the Policy Does Not Afford Coverage for the Claim – Against All Defendants)**

69. ALPS incorporates and realleges paragraphs 1 through 68 as if fully set forth herein.

***Prior Knowledge***

70. The Policy potentially provides coverage for claims only if "[a]t the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the Wrongful Act might be the basis of a Claim[.]" (Exhibit 1, Insuring Agreements § 1.A.2).

71. The Policy excludes from coverage any claim arising from or in connection with "[a]ny Wrongful Act that occurred prior to" the Policy's December 19, 2023 effective date if:

> Prior to the Effective Date of this Policy, any Insured gave or should have given to any insurer, notice of a Claim or potential Claim arising from or in connection with the Wrongful Act, or from any Wrongful Act that is connected temporally, logically or causally, by any common fact, circumstance, situation, transaction, event, advice or decision to the Claim or potential Claim.

(Exhibit 1, Exclusions § 3.E.3).

72. Under the Policy, "Wrongful Act" is defined as "an actual or alleged: [a]ct, error, or omission by the Insured in the performance of Professional Services; and [a] Personal Injury resulting from the Professional Services of the Insured." (Exhibit 1, Definitions § 2.BB).

73. The following occurred prior to the Policy's December 19, 2023 effective date:

a. On May 25, 2021, on behalf of Cobb, the Sheikh Defendants filed Cobb's complaint in the Cobb Suit. (Exhibit 4).

b. On August 21, 2023, DFW filed a "Notice of Settlement" in the Cobb Suit. (Exhibit 4; Exhibit 2 ¶ 17).

c. On September 22, 2023, the parties in the Cobb Suit filed a Stipulation and Proposed Order to Dismiss the Cobb Suit with prejudice. (Exhibit 4). The Sheikh Defendants "authorized the opposing parties to apply [Sheikh's] signature to [the] proposed stipulation and order to dismiss [the Cobb Suit], despite" Cobb's

"reject[ion] [of] the settlement offer." (Exhibit 5 at 2). The Sheikh Defendants admit: "[t]he opposing parties filed the proposed order with the court" in the Cobb Suit, "which the district court signed and dismissed the matter"; the "court electronically served [Sheikh] with the dismissal order, but [Sheikh] did not inform [Cobb], who found out about the dismissal through an independent search of court records"; and Sheikh "did not ensure receipt of the settlement proceeds and thus [Cobb] did not receive the funds." (*Id*. at 1-2).

d. On October 13, 2023, Cobb filed the Cobb Bar Complaint against Sheikh with the Nevada State Bar arising from the Sheikh Defendants' representation of Cobb in the Cobb Suit. (Exhibit 6 ¶ 60).

e. On October 24, 2023, the Nevada State Bar "emailed [Sheikh] a letter of inquiry to" the email on file with the Supreme Court of Nevada, "seeking a response to" the Cobb Bar Complaint. (Exhibit 6 ¶ 63).

f. On November 7, 2023, Sheikh replied to the Nevada State Bar's October 24, 2023 communication and agreed to contact Cobb. (Exhibit 6 ¶ 64).

g. On November 13, 2023, the Nevada State Bar "emailed [Sheikh] a letter of investigation" concerning the Sheikh Defendants' representation of Cobb in the Cobb Suit and Sheikh "did not reply to the November 13, 2023 letter of investigation." (Exhibit 6 ¶¶ 67-68).

74. Despite the events and allegations described above, the Sheikh Defendants did not notify ALPS of any actual or potential claim, or any act, error, or omission by them which might be the basis of a claim against any of the Sheikh Defendants prior to the Policy's December 19, 2023 effective date.

75. Cobb first notified ALPS of the Claim and the circumstances from which the Claim could arise via the May 2024 Correspondence. (Exhibit 7).

76. The Claim, as articulated in the Underlying Suit, is outside the coverage afforded by the Policy because: (a) prior to the December 19, 2023 effective date of the Policy, the Sheikh Defendants knew or reasonably should have known the acts, errors, or omissions alleged in the Claim might be the basis of a claim; (b) prior to the Policy's December 19, 2023 effective date, the Sheikh Defendants should have given ALPS notice of the acts, errors, or omissions that form the basis of the Claim or the potential claims against the Sheikh Defendants

arising from the acts, errors, or omissions that form the basis of the Claim; (c) the Sheikh Defendants did not notify ALPS of the acts, errors, or omissions that form the basis of the Claim or the potential claims against the Sheikh Defendants arising from the acts, errors, or omissions that form the basis of the Claim; and (d) Cobb first notified ALPS of the Claim and the circumstances from which the Claim could arise via the May 2024 Correspondence, after inception of the Policy.

***Policy Conditions***

77. The Policy does not afford coverage for the Claim to the extent the Sheikh Defendants breached a condition precedent to coverage under the Policy.

78. The Policy provides:

> C. ASSISTANCE AND COOPERATION OF THE INSURED
>
> 1. Each Insured shall cooperate with the Company in its investigation of any Claim, including, without limitation, by promptly complying with all requests for and Insured to submit to or to provide any statements, including any sworn statements or statements under oath of any Insured, reports, documents, or other information, and by providing copies of all pertinent files upon request.
>
> 2. Each Insured shall cooperate and assist, as requested, in the defense of any Claim, in making any settlements, and in enforcing any right of contribution or indemnity against any person. If requested by the Company, such assistance may include, without limitation, attendance at hearings and trials and assistance in securing and giving evidence and in obtaining the attendance of witnesses. Neither the Insured nor the Insured's legal representative shall impede the Company's investigation or defense of any Claim. Neither the Insured nor the Insured's legal representative shall in any manner impair the right of the Company to make any settlement that the Company deems, in its discretion, to be reasonably necessary pursuant to any statutory or common law requirements concerning the fair or unfair claim settlement practices of insurers.
>
> 3. Each Insured shall notify the Company of any demand to arbitrate a Claim against an Insured, and any right to demand arbitration of a Claim, and in the event the Company elects to proceed with arbitration, shall cooperate in any such proceeding.
>
> 4. No Insured shall, without the Company's prior written consent, engage in any of the following with respect to any Claim or potential Claim: (a) make any payments; (b) admit any liability; (c) stipulate to the entry of a judgment against

> the Insured; (d) settle any Claim; (e) assume any obligation; (f) negotiate any tolling agreement; or (g) incur any expense. If an Insured engages in or offers to engage in any of the foregoing, the Insured shall do so at the Insured's own liability and expense, and such engagement, action or offer by the Insured shall be deemed to be a breach of the Insured's duty to cooperate with the Company with respect to such Claim or potential Claim.

(Exhibit 1, Conditions § 6.C).

79. Subsequent to ALPS's receipt of the May 2024 Correspondence, ALPS and Defense Counsel repeatedly attempted to contact the Sheikh Defendants by telephone, email, and with an in-person visit to the Sheikh Firm's office, all without success and without any response from the Sheikh Defendants. The Sheikh Defendants similarly failed to respond to the August 2024 Correspondence and July 2025 Correspondence, reiterating ALPS's prior requests for all materials pertaining to the representation of Cobb incident to the Claim.

80. The Sheikh Defendants' breach of the General Conditions provided in Section 6.C of the Policy prejudiced the investigation and defense of the Sheikh Defendants against the Claim.

81. The Policy does not afford coverage for the Claim because the Sheikh Defendants breached the Policy's General Conditions and prejudiced the investigation and defense of the Sheikh Defendants against the Claim.

***Damages***

82. The Policy does not afford coverage for the Claim to the extent the relief sought incident to the Claim does not constitute "Damages" as defined in the Policy. (Exhibit 1, Insuring Agreements § 1.A & Definitions § 2.H).

83. The Policy specifically excludes from the definition of "Damages", in relevant part:

> 3. Punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorney's

fees or costs, or pre-judgment or post-judgment interest resulting therefrom, regardless against whom the same are levied or imposed and regardless of whether the same were levied or imposed in a separate matter or proceeding;

* * *

5. Injunctive, declaratory, or other equitable relief, or costs or fees incident thereto;

6. Restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured;

7. Judgment, award, verdict, decision or order that includes, as a measure, element or portion of the damages or award set forth therein, any amount the basis of which was determined by reference to the amount of fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an Insured; [and]

8. Injury or damage to, destruction of, loss of, or loss of use of any funds or property[.]

(Exhibit 1, Definitions §§ 2.H.3, 2.H.5-8).

84. In the Underlying Suit, Cobb seeks, *inter alia*: punitive damages against the Sheikh Defendants, “jointly and severally, . . . in an amount to be determined by the [c]ourt”; attorneys’ fees and $843.49 in costs incident to the Underlying Suit; and prejudgment and post-judgment interest. (Exhibit 2, Prayer for Relief; Exhibit 8 at pp. 10-11).

85. As to punitive damages, Cobb alleges “[g]iven the outrageous and intentional misconduct committed by” the Sheikh Defendants, Cobb “is entitled to an award of punitive damages”; the Sheikh Defendants’ “actions have been committed with fraud, oppression and/or malice, entitling [Cobb] to punitive damages against” the Sheikh Defendants; and Cobb is entitled to punitive damages “in excess of $1,800,000”, which is “three times compensatory damages [Cobb] is claiming”. (Exhibit 8 at pp. 10-11; Exhibit 2 ¶ 35).

86. Cobb’s demand for punitive damages, and attorneys’ fees and costs and prejudgment and post-judgment interest resulting therefrom, are excluded from the definition of “Damages” and outside the coverage afforded by the Policy because such amounts are

"[p]unitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorney's fees or costs, or pre-judgment or post-judgment interest resulting therefrom[.]" (Exhibit 1, Definitions § 2.H.3).

87. In the February 2025 Order, the Supreme Court of the State of Nevada—relying on Sheikh's admissions—determined Sheikh "did not ensure receipt of the settlement proceeds" in the Cobb Suit "and thus [Cobb] did not receive the funds." (Exhibit 5 at 2). In the August 2025 Complaint, Cobb alleges the Sheikh Defendants "breached their fiduciary duties by", *inter alia*, "failing to disburse the entirety of [Cobb]'s settlement proceeds" in the Cobb Suit. (Exhibit 2 ¶ 55). In the August 2026 Default Judgment Application in the Underlying Suit, Cobb alleges: the Sheikh Defendants "made a deal behind [Cobb's] back to accept the low settlement offer from Westgate and [the Cobb Suit] was dismissed without [Cobb] receiving any justice"; Cobb "never received one penny of the settlement that [the Sheikh] Defendants kept for themselves"; Cobb continues "to experience a great deal of physical pain, mental anguish, and stress to go along with the tens of thousands of dollars the [Sheikh] Defendants stole from [Cobb] and the much higher amount of money [Cobb's] case was worth"; and the Sheikh Defendants "have converted and unjustly retained [Cobb]'s property in a despicable and inequitable manner." (Exhibit 8 at p. 11 & Declaration of Cobb in Support of the August 2026 Default Judgment Application ¶¶ 11-14).

88. Cobb's demand for the disgorgement of the settlement funds in the Cobb Suit, which Cobb alleges the Sheikh Defendants "stole" and "kept for themselves", are excluded from the definition of "Damages", and outside the coverage afforded by the Policy, because Cobb seeks (a) restitution or disgorgement of funds or property presently or formerly held or in any manner directly or indirectly controlled by an Insured and (b) injury or damage to, destruction of, loss of, or loss of use of any funds or property. (Exhibit 1, Definitions §§ 2.H.6, 2.H.8).

***Exclusions***

89. The Policy does not afford coverage for the Claim to the extent any exclusions in the Policy apply to exclude coverage.

***a. Exclusion 3.H***

90. The Policy specifically excludes coverage for any claim arising from or in connection with "[a]ny loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property[.]" (Exhibit 1, Exclusions § 3.H).

91. In the February 2025 Order, the Supreme Court of the State of Nevada—relying on Sheikh's admissions—determined Sheikh "did not ensure receipt of the settlement proceeds" in the Cobb Suit "and thus [Cobb] did not receive the funds." (Exhibit 5 at 2). In the August 2025 Complaint, Cobb alleges the Sheikh Defendants "breached their fiduciary duties by", *inter alia*, "failing to disburse the entirety of [Cobb]'s settlement proceeds" in the Cobb Suit. (Exhibit 2 ¶ 55).

92. In the August 2026 Default Judgment Application, Cobb alleges: the Sheikh Defendants "made a deal behind [Cobb's] back to accept the low settlement offer from Westgate and [the Cobb Suit] was dismissed without [Cobb] receiving any justice"; Cobb "never received one penny of the settlement that [the Sheikh] Defendants kept for themselves"; Cobb continues "to experience a great deal of physical pain, mental anguish, and stress to go along with the tens of thousands of dollars the [Sheikh] Defendants stole from [Cobb] and the much higher amount of money [Cobb's] case was worth"; and the Sheikh Defendants "have converted and unjustly

retained [Cobb]'s property in a despicable and inequitable manner." (Exhibit 8 at p. 11 & Declaration of Cobb in Support of the August 2026 Default Judgment Application ¶¶ 11-14).

93. To the extent the Claim arises from or in connection with any loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an insured in any capacity or under any authority, the Policy would not afford coverage.

***b. Exclusion 3.I***

94. The Policy specifically excludes coverage for any claim arising from or in connection with "[a]ny dispute over fees or costs, or any Claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held or controlled at any time by an Insured[.]" (Exhibit 1, Exclusions § 3.I).

95. In the February 2025 Order, the Supreme Court of the State of Nevada—relying on Sheikh's admissions—determined Sheikh "did not ensure receipt of the settlement proceeds" in the Cobb Suit "and thus [Cobb] did not receive the funds." (Exhibit 5 at 2). In the August 2025 Complaint, Cobb alleges the Sheikh Defendants "breached their fiduciary duties by", *inter alia*, "failing to disburse the entirety of [Cobb]'s settlement proceeds" in the Cobb Suit. (Exhibit 2 ¶ 55).

96. In the August 2026 Default Judgment Application, Cobb alleges: the Sheikh Defendants "made a deal behind [Cobb's] back to accept the low settlement offer from Westgate and [the Cobb Suit] was dismissed without [Cobb] receiving any justice"; Cobb "never received one penny of the settlement that [the Sheikh] Defendants kept for themselves"; Cobb continues "to experience a great deal of physical pain, mental anguish, and stress to go along with the tens of thousands of dollars the [Sheikh] Defendants stole from [Cobb] and the much higher amount

of money [Cobb's] case was worth"; and the Sheikh Defendants "have converted and unjustly retained [Cobb]'s property in a despicable and inequitable manner." (Exhibit 8 at p. 11 & Declaration of Cobb in Support of the August 2026 Default Judgment Application ¶¶ 11-14).

97. To the extent the Claim seeks, whether directly or indirectly, the return or reimbursement of funds or property held or controlled at any time by an insured, the Policy would not afford coverage.

***c. Exclusion 3.A***

98. The Policy specifically excludes coverage for any claim arising from or in connection with "[a]ny dishonest, fraudulent, criminal, malicious, or intentionally harmful Wrongful Act committed by, at the direction of, or with the consent of an Insured[.]" (Exhibit 1, Exclusions § 3.A). The Policy defines "Wrongful Act" to mean "an actual or alleged: (1) [a]ct, error, or omission by the Insured in the performance of Professional Services; and (2) [a] Personal Injury resulting from the Professional Services of the Insured." (*Id.*, Definitions § 2.BB).

99. In the August 2025 Complaint, Cobb alleges: the Sheikh Defendants "may be liable for punitive damages to the extent the evidence shows that (1) [the Sheikh Defendants] are guilty of 'oppression, fraud or malice, express or implied,' (2) [the Sheikh Defendants'] actions constituted conduct intended to injure [Cobb], and/or (3) [the Sheikh Defendants'] actions constitute 'despicable conduct which is engaged in with a conscious disregard of the rights of others' under NRS 42.001(3)." (Exhibit 2 ¶ 35). Cobb further alleges "[t]o the extent [the Sheikh Defendants] acted intentionally and/or in concert with each other, [the Sheikh Defendants] are subject to joint and several liability for all damages resulting therefrom." (*Id.* ¶ 36).

/ /

100. In the August 2026 Default Judgment Application, Cobb alleges: the Sheikh Defendants "made a deal behind [Cobb's] back to accept the low settlement offer from Westgate and [the Cobb Suit] was dismissed without [Cobb] receiving any justice"; Cobb "never received one penny of the settlement that [the Sheikh] Defendants kept for themselves"; Cobb continues "to experience a great deal of physical pain, mental anguish, and stress to go along with the tens of thousands of dollars the [Sheikh] Defendants stole from [Cobb] and the much higher amount of money [Cobb's] case was worth"; "[a]s a result of [the Sheikh] Defendants lies and misconduct, [Cobb] has had to retain counsel and incur additional costs"; "[g]iven the outrageous and intentional misconduct committed by" the Sheikh Defendants, Cobb "is entitled to an award of punitive damages"; the Sheikh Defendants' "actions have been committed with fraud, oppression and/or malice, entitling [Cobb] to punitive damages against" the Sheikh Defendants; the Sheikh Defendants "have converted and unjustly retained [Cobb]'s property in a despicable and inequitable manner." (Exhibit 8 at pp. 10-11 & Declaration of Cobb in Support of the August 2026 Default Judgment Application ¶¶ 11-15).

101. To the extent the Claim arises from or in connection with any dishonest, fraudulent, criminal, malicious, or intentionally harmful Wrongful Act committed by, at the direction of, or with the consent of an Insured, the Policy would not afford coverage.

***Definition of Claim***

102. The Policy only affords coverage with respect to damages arising from or in connection with a "Claim" against the Insured, provided the "Claim arises from a Wrongful Act[.]" (Exhibit 1, Insuring Agreements § 1.A).

103. The Policy defines "Claim" as "a demand for money or services including, but not necessarily limited to, the service of suit or institution of arbitration or alternative dispute resolution proceedings against the Insured." (Exhibit 1, Definitions § 2.C). "Wrongful Act" is

defined as "an actual or alleged: (1) [a]ct, error, or omission by the Insured in the performance of Professional Services; and (2) [a] Personal Injury resulting from the Professional Services of the Insured." (*Id.*, Definitions § 2BB).

104. The Policy specifically excludes from the definition of "Claim" any "demand, service or proceeding arising from or in connection with any actual or alleged:"

> 7. Notice or written demand arising from or in connection with any disciplinary, investigatory or other proceeding before a state licensing board, peer review committee or governmental regulatory body involving an Insured Attorney; . . . [or]
>
> 10. Bodily Injury of any person.

(Exhibit 1, Definitions §§ 2.C.7, 2.C.10) (emphasis in original).

105. The Policy defines "Bodily Injury" as "any injury to the body, any sickness or disease, or any death", and "includes any mental, psychological, or emotional injury, anguish, tension, distress, pain, suffering, shock or death, regardless of whether or not such condition arises from any injury to the body, from any sickness or disease, or from any death." (Exhibit 1, Definitions § 2.B).

106. On October 13, 2023, Cobb filed the Cobb Bar Complaint against Sheikh with the Nevada State Bar arising from the Sheikh Defendants' representation of Cobb in the Cobb Suit. (Exhibit 5 at 1; Exhibit 6 ¶ 60). On June 14, 2024, the State Bar of Nevada filed the June 2024 Bar Complaint against Sheikh in the Sheikh Disciplinary Proceedings. (Exhibit 6). In the June 2024 Bar Complaint, the State Bar of Nevada addressed Cobb's allegations in the Cobb Bar Complaint and other matters. (Exhibit 5 at 1; Exhibit 6).

107. Cobb's allegations in the May 2024 Correspondence, the June 2025 Correspondence, and the August 2025 Complaint may not meet the definition of a covered "Claim" under the Policy to the extent they arise from or in connection with any actual or alleged

notice or written demand arising from or in connection with any disciplinary, investigatory, or other proceeding before a state licensing board, peer review committee, or governmental regulatory body involving Sheikh or any other Insured Attorney. (Exhibit 1, Definitions § 2.C.7; Exhibit 5 at 1; Exhibit 6; Exhibit 2).

108. In the June 2025 Correspondence, Cobb alleges he "suffered . . . emotional damages as a result" of the Sheikh Defendants' "ineffective and negligent representation" of Cobb in the Cobb Suit. (Exhibit 3 at 1-2). In the August 2026 Default Judgment Application, Cobb seeks "$1,800,000.00 in pain and suffering damages" and alleges he continues "to experience a great deal of physical pain, mental anguish, and stress to go along with the tens of thousands of dollars the [Sheikh] Defendants stole from" Cobb. (Exhibit 8 at p. 11 & Declaration of Cobb in Support of the August 2026 Default Judgment Application ¶ 14).

109. To the extent Cobb's allegations against the Sheikh Defendants in this matter arise from or in connection with any actual or alleged Bodily Injury, which includes mental or emotional injury or distress of any person, the Policy would not afford coverage.

***Professional Services***

110. The Policy does not afford coverage for the Claim, as articulated in the Underlying Suit, to the extent the Claim does not arise from an act, error, or omission by the Sheikh Defendants in the performance of Professional Services, as defined by the Policy. (Exhibit 1, Insuring Agreements § 1.A.1 & Definitions § 2.Z).

111. Under the Policy, "Professional Services" are defined as "services or activities . . . rendered solely to others as . . . [a]n Attorney in an attorney-client relationship on behalf of one or more clients applying the Attorney's specialized education, knowledge, skill, labor, experience and/or training, including pro bono services[.]" (Exhibit 1, Definitions § 2.Z.1).

112. The Policy provides "Professional Services does *not* mean nor include any . . . [h]olding, possessing, controlling, supervising, disbursing, or otherwise handling or overseeing in any manner or nature whatsoever any funds or property of the Insured, or of any client, trust, estate, person, or any other third party[.]" (Exhibit 1, Definitions § 2.Z.13) (emphasis in original).

113. In the February 2025 Order, the Supreme Court of the State of Nevada—relying on Sheikh's admissions—determined Sheikh "did not ensure receipt of the settlement proceeds" in the Cobb Suit "and thus [Cobb] did not receive the funds." (Exhibit 5 at 2). In the August 2025 Complaint, Cobb alleges the Sheikh Defendants "breached their fiduciary duties by", *inter alia*, "failing to disburse the entirety of [Cobb]'s settlement proceeds" in the Cobb Suit. (Exhibit 2 ¶ 55).

114. In the August 2026 Default Judgment Application, Cobb alleges: the Sheikh Defendants "made a deal behind [Cobb's] back to accept the low settlement offer from Westgate and [the Cobb Suit] was dismissed without [Cobb] receiving any justice"; Cobb "never received one penny of the settlement that [the Sheikh] Defendants kept for themselves"; Cobb continues "to experience a great deal of physical pain, mental anguish, and stress to go along with the tens of thousands of dollars the [Sheikh] Defendants stole from [Cobb] and the much higher amount of money [Cobb's] case was worth"; and the Sheikh Defendants "have converted and unjustly retained [Cobb]'s property in a despicable and inequitable manner." (Exhibit 8 at p. 11 & Declaration of Cobb in Support of the August 2026 Default Judgment Application ¶¶ 11-14).

115. To the extent the Claim arises from or in connection with holding, possessing, controlling, supervising, disbursing, or otherwise handling or overseeing in any manner or nature whatsoever any funds or property of the Insured, or of any client, trust, estate, person, or any

other third party, the Claim would not arise from an act, error, or omission in the performance of Professional Services and the Policy would not afford coverage.

116. An actual controversy exists between ALPS and Defendants regarding whether the Policy affords coverage for the Claim.

117. Because the Claim is outside the coverage afforded by the Policy, ALPS is entitled to a declaratory judgment in its favor, pursuant to 28 U.S.C. § 2201, declaring the Policy does not afford coverage for the Claim and ALPS has no duty to defend or indemnify Defendants with respect to the Claim.

**SECOND CAUSE OF ACTION**

**(Reimbursement of Defense Expenses – Against the Sheikh Defendants)**

118. ALPS incorporates and realleges paragraphs 1 through 117 as if fully set forth herein.

119. The Policy states ALPS has no duty to defend or pay Claim Expenses for "any Claim not covered" and has "the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered Claim, including any amount paid in defending a non-covered Claim that is asserted together with one or more covered Claims." (Exhibit 1, Insuring Agreements § 1.B.2).

120. The Policy defines "Claim Expenses" to mean, in relevant part, "[f]ees charged by any attorney(s) designated" by ALPS "to defend a Claim or otherwise represent an Insured;" and "[a]ll other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a Claim (including a suit or proceeding arising in connection therewith), if incurred by [ALPS]." (Exhibit 1, Definitions §2.D.).

121. ALPS provided the Sheikh Defendants with representation by Defense Counsel with respect to the Claim under the Policy subject to a complete reservation of rights, including

the right to seek recovery from the Sheikh Firm, Sheikh, or any insured under the Policy of all amounts paid by ALPS in defense of non-covered aspects of the Claim.

122. For the reasons described above in Paragraphs 69 through 115, the Claim is outside the coverage afforded by the Policy.

123. ALPS is entitled to judgment in its favor and against the Sheikh Defendants for the amount of attorneys' fees and costs paid to defend the Sheikh Defendants with respect to the Claim because the Claim is not covered under the Policy.

WHEREFORE, ALPS prays that judgment be entered in its favor and against Defendants as follows:

1. Declaring the Policy does not afford coverage to the Sheikh Defendants for the Claim, as articulated in the Underlying Suit;

2. Declaring ALPS has no duty to defend or indemnify the Sheikh Defendants under the Policy with respect to the Claim, as articulated in the Underlying Suit;

3. Awarding damages in favor of ALPS and against the Sheikh Defendants in the amount of the attorneys' fees and costs paid to defend the Sheikh Defendants with respect to the Claim; and

4. Awarding ALPS such additional relief as shall be deemed appropriate in the circumstances, together with its costs and expenses.

Dated this 19th day of October, 2026.

ALPS PROPERTY & CASUALTY
INSURANCE COMPANY, Plaintiff

/s/ *Christian L. Moore*

Christian L. Moore, Esq. (SBN 3777)
Laxalt Law Group Ltd.
9790 Gateway Drive, Suite 200
Reno, Nevada 89521
(775) 322-1170